**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

**IN RE**

| | |
|---|---|
| **MARK HANKINS** | **CASE NO. 21-20019** |
| **DEBTOR** | |
| **MARK HANKINS,** *derivatively* | **PLAINTIFF** |
| *on behalf of the Chapter 13 Trustee* | |
| **V.** | **ADV. NO. 21-2003** |
| **CKK PROPERTIES, LLC** | **DEFENDANT** |

**MEMORANDUM OPINION**

Plaintiff/Debtor Mark Hankins sold his home to Defendant CKK Properties, LLC prepetition.   Despite having almost $40,000 in equity in the property, Hankins received no funds at closing.   CKK also did not satisfy Hankins' mortgage debt on the property in connection with the purchase; instead, it purchased Hankins' residence "subject to" the mortgage and promised to make monthly payments on Hankins' loan while he remained personally liable on that debt.

Hankins filed this case against CKK with derivative standing to act on behalf of his chapter 13 bankruptcy estate.   The primary issue litigated at the trial held on February 24 and March 8, 2022, concerned whether Hankins received reasonably equivalent value for challenged transfers to CKK.   The Court requested and received limited post-trial briefing.   Because Hankins proved that the sale of the residence to CKK constituted a constructively fraudulent transfer, Hankins' chapter 13 estate is entitled to damages from CKK.

## I.    Procedural Background and Findings of Fact.[1]

### A.    Hankins files his first chapter 13 bankruptcy case.

Hankins purchased a home in 2013 located at 2732 Shamu Drive in Hebron, Kentucky (the "Shamu Property") with a loan secured by a mortgage ultimately serviced by Nationstar Mortgage LLC d/b/a Mr. Cooper ("Nationstar").   In January 2019, Hankins was behind on his mortgage payments.   He engaged attorney Aaron Beck to file a bankruptcy case.   Hankins' confirmed chapter 13 plan in that case required him to make contractual post-petition mortgage payments directly to Nationstar.   Hankins failed to do so and Nationstar moved for relief from the automatic stay.   Hankins and Nationstar resolved the motion via an agreed order entered in October 2019, which allowed Nationstar to foreclose on the Shamu Property if Hankins did not pay the arrears and maintain his mortgage payments pursuant to the agreed order's terms.

### B.    Hankins lists the Shamu Property for sale, drawing CKK's interest, and dismisses his first bankruptcy case to enable a sale to CKK.

Around this same time, Hankins listed the Shamu Property for sale.   He offered potential buyers a carpet and paint credit given damage Hankins' pets caused to the home's interior. CKK, through its agent Lori Matthews, contacted Hankins with interest in buying the Shamu Property.   Hankins and Matthews began communicating through a series of text messages and emails, including about the terms of a potential sale of the Shamu Property to CKK.   Plaintiff testified that it was through these messages that Matthews became aware of "everything" in his life, including his credit history and his inability to make his mortgage payments.   Neither party moved the text or email exchanges into evidence at trial.[2]

---

[1] Unless otherwise indicated, all record citations are to documents filed in this proceeding.

[2] Counsel for the parties examined witnesses using several documents, which were not joint exhibits, that they did not offer into evidence at trial.   Unless stipulated to, for an exhibit to be considered a part of the trial record, the exhibit must be offered into evidence by a party and admitted into evidence by the Court, thereby preserving any

At trial, Hankins' former bankruptcy attorney, Beck, testified that he and Matthews discussed CKK's interest in purchasing the Shamu Property from Hankins.   Beck told Matthews that the bankruptcy court likely would not approve a sale to CKK on the proposed terms.   While no purchase agreement was introduced into evidence, the witness testimony included that the agreement contained two significant terms: (1) CKK agreed to make payments to Nationstar on Hankins' mortgage debt, and (2) CKK granted Hankins a month-to-month tenancy in the Shamu Property for up to five months after the closing at the rental rate of $800 per month.

Gery Conner, a member of CKK, testified that CKK subsequently conditioned an offer to purchase the Shamu Property on Hankins' dismissal of his bankruptcy case.   Hankins voluntarily dismissed his case in January 2020 and agreed to sell the Shamu Property to CKK.

On February 18, 2020, before the sale was consummated, Nationstar filed a state court complaint to foreclose on the mortgage on the Shamu Property based on payment deficiencies.

### C.    Hankins receives no funds at the closing for the sale of the Shamu Property to CKK.

On February 26, 2020, Hankins appeared at the office of Novakov Law, PLLC, and attorney Linda Novakov, for a closing on the Shamu Property's sale to CKK.   Novakov

---

rulings on admission for appeal under Federal Rule of Evidence 103.

The Court also has discretion to exercise control over the manner of presenting evidence.   FED. R. EVID. 611.   The Court exercised that discretion in part via its Order for Trial, which required parties to offer exhibits for admission into evidence at trial.   [ECF No. 44 ¶2 ("Unless written objections to the authenticity and/or admissibility of each such exhibit are filed . . ., the exhibit shall be deemed authentic and may be admitted upon request of the party to admit the exhibit into evidence at trial.   In the absence of good cause, no exhibit may be offered in evidence except upon compliance with the conditions contained in this order.").]   *See also Moore v. Granlund*, No. 3:12-CV-00223, 2021 U.S. Dist. LEXIS 223252, at *16 (M.D. Pa. Nov. 18, 2021) ("If the parties can agree on the admissibility of certain exhibits, they must docket with the Court in advance of trial a stipulation detailing which documents they will accept into evidence without objection.   All documents on which the parties cannot reach agreement must be offered into evidence at trial and will be admitted only if doing so accords with the Federal Rules of Evidence.") (footnote omitted); *Slade v. State*, 485 S.E.2d 726, 728 (Ga. 1997) ("A party must offer into evidence those documents upon which he relies.").

.

routinely performs real estate closings.   No CKK representative attended the closing.   Novakov

took all actions necessary to close the sale transaction.   She prepared the deed, the closing

statement, and other closing documents, and acted as the escrow agent (through an affiliated

entity, Blue Moon Title Agency ("Blue Moon")).

Novakov had a prior business relationship with CKK.   She had performed several real

estate closings for CKK.   She also was its landlord and her self-directed IRA had loaned money

to CKK in an amount not disclosed at trial.   Conversely, Novakov had not met Hankins prior to

the closing, let alone been engaged to do work for him.   At the closing, Hankins asked Novakov

questions about employment law issues, but Novakov did not give Hankins legal advice; rather,

she referred Hankins to other attorneys with expertise in that area.   Both Hankins and CKK paid

Novakov for preparing documents for the closing and acting as the escrow agent, but she was

otherwise financially disinterested in the transaction.

At the hour-long closing, Novakov presented documents for Hankins' review and

signature, and Hankins voluntarily signed the closing documents, including the settlement

statement (HUD-1) and the warranty deed that transferred the Shamu Property from Hankins to

CKK for the stated consideration of $168,000.   The warranty deed, recorded on March 6, 2020,

provided that "said Property is conveyed subject to the Mortgage from Mark A. Hankins"

assigned to Nationstar.   [ECF No. 69-41.]   CKK did not, however, execute any agreement with

Nationstar by which CKK assumed responsibility for the Shamu Property loan and released

Hankins from that debt.   Nor did Hankins sign a lease agreement presented to him at the closing.

Hankins understood and agreed that a portion of the purchase price for the Shamu

Property would be paid directly to Nationstar to satisfy Hankins' mortgage arrearage.   CKK

provided funds to Blue Moon in connection with the closing to make the cure payment.   Blue

Moon wired $16,064.23 to Nationstar or its agent on February 27, 2020.    Nationstar applied

these funds to Hankins' account the next day to cure the mortgage arrears and defray related

charges and legal fees due and dismissed its foreclosure suit against Hankins.    After applying

this payment, the principal balance on Hankins' mortgage debt was $112,032.10.

Other credits to the purchase price in CKK's favor included (1) a $3,000 paint and carpet

credit (consistent with the credit Hankins offered when he listed the Shamu Property); (2) a

$248.14 credit for prorated taxes (2020 county real estate taxes attributable to the pre-closing

period during which Hankins owned the Shamu Property and which Novakov called a typical

credit afforded at a real estate closing); (3) a $23,500 "holdback" for a "principal reduction"; and

(4) a $9,000 "holdback" for possession.

As to the two "holdback" credits against the purchase price, Conner testified that the

$23,500 withheld from Hankins at the closing represented the $800 monthly rent payment due

from Hankins to CKK over 30 months ($24,000, less $500 so that Hankins would not need to

bring money to the closing).    According to Connor, CKK required the holdback to protect CKK

from the risk that Hankins may fail to make monthly rent payments—as he had fallen

significantly behind on his mortgage payments.    Conner explained that the $23,500 holdback

also would ensure CKK's ability to make mortgage payments to Nationstar and pay Hankins the

$9,000 holdback credit due to him when he ultimately vacated the Shamu Property.    Hankins,

on the other hand, testified he did not understand the $23,500 holdback credit.    As to the $9,000

holdback credit, Hankins understood that CKK would pay Hankins this amount in connection

with his departure from the Shamu Property—but it was unclear to Hankins exactly when the

payment would be made to him.    Novakov testified that she had no input into the credits taken

against the purchase price; rather, Novakov received information from CKK regarding the terms

of sale, including the credits, and prepared the paperwork consistent with CKK's instructions.

### D. Disputes arise shortly after the closing and the parties enter into the Settlement Agreement.

Hankins was immediately dissatisfied with the closing because he left Novakov's office

without receiving any funds in exchange for conveying the Shamu Property to CKK.   As a

result, Hankins refused to provide CKK with either the Nationstar mortgage statements or

information that would allow CKK to access the mortgage account and confirm the monthly

payment which it had agreed to pay.   Starting at the end of April 2020, an affiliate of CKK,

JCNK Properties, LLC, began sending monthly checks to Nationstar for $784.84—the amount

CKK understood to be Hankins' monthly mortgage payment.   But, unbeknownst to CKK, the

monthly amount due to Nationstar had increased.   Consequently, Nationstar was not receiving

full monthly mortgage payments on Hankins' loan, leading to mounting delinquencies.

Although Hankins continued to reside at the Shamu Property after the closing, he did not

pay CKK monthly rent.   CKK sent Hankins demands for rent in March 2020.   CKK then

advised Hankins that it would deduct past-due rent owed to CKK from the $9,000 to be paid to

Hankins when he vacated the property.   Ultimately, CKK sent Hankins a notice on June 18,

2020, purporting to terminate his tenancy in 30 days and demanding that he surrender possession

of the Shamu Property or CKK would file a lawsuit to evict him.

Hankins retained attorney James Noll in June 2020, and the parties signed an agreement

to resolve their dispute as of July 13, 2020.   [ECF No. 69-56 (the "Settlement Agreement").]

The Settlement Agreement provided that CKK had contracted with Hankins to purchase the

Shamu Property on January 29, 2020, and that Hankins had "defaulted on the terms of the

Contract."   [*Id.*]   Pursuant to the Settlement Agreement, among other terms, (1) Hankins

6

received $5,000 from CKK immediately; (2) Hankins received "the right to stay in the property

rent free through November 15, 2020" and CKK forfeited "any claim for future and past due

rents from Hankins;" (3) CKK confirmed it would make Hankins' mortgage payments for the

Shamu Property, (4) CKK agreed to pay Hankins $4,000 "when Hankins provides proof of a new

place which results in Hankins vacating the property by November 15, 2020;" (5) "Hankins

agree[d] to allow CKK to show the property one hour per week beginning October 1, 2020"; and

(6) the parties provided broad mutual releases.   [*Id.*]

### E.    The parties continue to disagree about Plaintiff's tenancy at the Shamu Property, leading CKK to file a forcible detainer action.

Notwithstanding the Settlement Agreement, new disagreements arose in October 2020.

Hankins provided a signed lease to CKK's counsel demonstrating his intent to vacate the Shamu

Property.   He claimed this act triggered CKK's duty to pay him $4,000 under the Settlement

Agreement.   CKK disagreed, contending that CKK was not obliged to make the payment until

Hankins vacated the Shamu Property.   CKK attempted to show the Shamu Property to potential

tenants per the Settlement Agreement.   Hankins refused to provide access until he received the

$4,000 payment.   Attempting to resolve the dispute, CKK paid $2,000 to Hankins' counsel,

Noll, as a partial payment on the $4,000 promised to Hankins.   Hankins testified that he did not

authorize Noll to accept the payment on his behalf and continued to prevent CKK from showing

the Shamu Property.

The next month, on November 6, 2020, CKK filed a forcible detainer action against

Hankins in Boone County (Kentucky) District Court, alleging Hankins refused to permit CKK

access to the property.   Contrary to the Settlement Agreement's terms, Hankins did not vacate

the Shamu Property by November 15, 2020.   The state district court held a trial and found

Hankins guilty of a forcible detainer on December 7, 2020.   Hankins appealed that decision.

The state circuit court affirmed in a written Opinion and Order dated March 19, 2021, which found in part that Hankins was not owed $4,000 until he vacated the Shamu Property.   Hankins did not further appeal from that ruling.   The Sherriff forcibly removed Hankins from the Shamu Property on March 25, 2021.   Hankins never paid CKK any rent during the period in which he was a tenant.

### F.    Hankins files his second chapter 13 bankruptcy case and this proceeding.

Through new counsel, Hankins filed a second chapter 13 bankruptcy case in January 2021.   CKK filed an unsecured claim in Hankins' new bankruptcy case for $9,600 in rent, and Nationstar filed a secured claim for $110,024.92 based on the Shamu Property note and mortgage.

After obtaining derivative standing, Hankins filed this proceeding against CKK on March 29, 2021, and filed an Amended Complaint on April 7, 2021.   The Amended Complaint seeks to avoid Hankins' transfer of his interest in the Shamu Property to CKK (the "Shamu Transfer") as a constructively fraudulent transfer under § 548(a)(1)(B)[3] (Count 1) and under § 544(b) and the Kentucky Uniform Voidable Transactions Act (the "UVTA") (Count 2).   Hankins also sought to avoid the transfers he made to CKK via the Settlement Agreement as constructively fraudulent.[4] The prayer for relief in the Amended Complaint requests a money judgment against CKK in the amount of $157,788.86, preserved for the benefit of the estate, under 11 U.S.C. §§ 542, 550, 551, and the UVTA.

---

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[4] The Amended Complaint also sought to avoid these transfers as actually fraudulent under § 548(a)(1)(A) and § 544 and the UVTA.   At the pretrial conference, Hankins' counsel confirmed that Hankins had abandoned that effort.

## II.      Jurisdiction.

The Court has jurisdiction over this adversary proceeding.    28 U.S.C. § 1334(b).    Venue

is proper.    28 U.S.C. § 1409.    It is a core proceeding under 28 U.S.C. § 157(b)(2)(H).    The

parties consent to the Court's entry of a final order and judgment.

## III.     Discussion.

### A.     Hankins seeks relief in this case on behalf of his bankruptcy estate.

The Amended Complaint provides that Hankins seeks relief "pursuant to the derivative

standing conferred onto him by the Chapter 13 Trustee[.]"    [ECF No. 11.]    The Sixth Circuit

explained the purpose of granting derivative standing to exercise a trustee's avoidance powers:

> … the bankruptcy trustee may…sue to invalidate property transfers that the
> debtors made before they filed for bankruptcy.    In this way, the trustee brings
> that property back where it belongs: in the bankruptcy estate.
>
> Sometimes the bankruptcy trustee does not want to do the dirty work, and
> sometimes the trustee simply cannot—like when it has run out of money to pay
> for lawyers.    The trustee has several options in these situations . . . .    [One option
> is that] the bankruptcy trustee can allow a creditor to sue on the trustee's behalf,
> giving the creditor "derivative standing."    The creditor becomes an additional
> named party, but the suit continues in the bankruptcy court and any recovery goes
> to the bankruptcy estate, not the creditor.

*Church J.V., L.P. v. Blasingame (In re Blasingame)*, 920 F.3d 384, 388-389 (6th Cir. 2019)

(citations omitted).    In addition to giving creditors derivative standing, a chapter 13 trustee also

may confer derivative standing upon a debtor.    *Countrywide Home Loans v. Dickson (In re*

*Dickson)*, 427 B.R. 399, 405-06 (B.A.P. 6th Cir. 2010) (holding chapter 13 debtor could be

granted derivative standing to pursue a lien avoidance action under §§ 544 and 547), *aff'd on*

*other grounds*, 655 F.3d 585 (6th Cir. 2011).

In Hankins' main case, the Court entered an agreed order between the Chapter 13 Trustee

and Hankins that conferred derivative standing upon Hankins to exercise the Trustee's powers

under §§ 542 and 548 via an adversary proceeding against CKK related to the Shamu Transfer,

9

as the Trustee declined to pursue such an action herself.   [Case No. 21-20019, ECF No. 45 ¶¶ 6-

7.]   The Court later entered an amended agreed order between the Trustee and Hankins that

affords Hankins standing to pursue relief on the estate's behalf under §§ 544 and 550 as well.

[Case No. 21-20019, ECF No. 86 (the "Derivative Standing Order").]   The Derivative Standing

Order provides: "Should [Hankins] prevail in its adversary proceeding, any nonexempt equity in

the [Shamu] Property, and any nonexempt property of [Hankins] that is turned over or avoided

shall be treated as property of the estate and treated in accordance with the terms of [a] chapter

13 plan, if one is confirmed."   [*Id*. ¶ 8.]

Any recovery in this case must inure to the bankruptcy estate's benefit, not to Hankins'

individual benefit.   The causes of action at issue and resulting remedies must be considered in

that light.

### B.    The Shamu Transfer was constructively fraudulent.

Hankins contends in Count 1 of the Amended Complaint that the Shamu Transfer should

be avoided as constructively fraudulent under § 548(a)(1)(B).   That section of the Code

provides, in pertinent part:

> (a) (1) The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the
> debtor in property, or any obligation (including any obligation to or for
> the benefit of an insider under an employment contract) incurred by the
> debtor, that was made or incurred on or within 2 years before the date of
> the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . .
>
> (B) (i) received less than a reasonably equivalent value in exchange for
> such transfer or obligation; and
>
>      (ii) (I) was insolvent on the date that such transfer was made or such
> obligation was incurred, or became insolvent as a result of such transfer or
> obligation;
>
>          (II) was engaged in business or a transaction, or was about to
> engage in business or a transaction, for which any property remaining with
> the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).   For purposes of § 548, "'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A).

Hankins contends in Count 2 of the Amended Complaint that § 544(b) and the UVTA (specifically K.R.S. § 378A.040(1)(b)) (the "State Law Claim") provide an alternative ground to avoid the Shamu Transfer.

The parties agreed that the Shamu Transfer met each element of § 548(a)(1)(B) and the State Law Claim except whether Hankins received reasonably equivalent value for the transfer. Hankins has the burden to prove that he received less than reasonably equivalent value by a preponderance of the evidence.   *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 341 (6th. Cir. 2006); KY. REV. STAT. § 378A.040(3).[5]

> Whether a debtor received "less than reasonably equivalent value" under § 548(a)(1)(B) "is a factual finding by the Court and in general, the concept requires that if there is any significant disparity between the market value of what the Debtor gave and what she received, a finding of reasonably equivalent value is precluded."   [*Wheatley v. Johnson (In re Johnson)*, 579 B.R. 796, 802 (Bankr. W.D. Ky. 2017)] (citation omitted).   "A court considering this question should first determine whether the debtor received any value in the exchange," and "[i]f so, the court should determine if the value received was reasonably equivalent." [*In re Wilkinson*,] 196 F. App'x at 337 (citation omitted).   "The date for

---

[5] The elements of a claim under § 548(a)(1)(B) and K.R.S. § 378A.040(1)(b) are nearly identical, and the parties agree that the sole issue presented for trial concerned whether Hankins received reasonably equivalent value in exchange for challenged transfers under both Counts of the Amended Complaint.   As the Court will award relief to Hankins under § 548(a)(1)(B), a separate discussion of the State Law Claim would be superfluous.

determining reasonable equivalence is the date of the transfer." *Id*. at 342 (citations omitted).

*Spradlin v. East Coast Miner, LLC (In re Licking River Mining, LLC)*, 603 B.R. 336, 366 (Bankr. E.D. Ky. 2019).   In determining whether value is reasonably equivalent,

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to unsecured creditors.   As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

*Congrove v. McDonald's Corp. (In re Congrove)*, 222 F. App'x 450, 454 (6th Cir. 2007) (citation omitted).

Hankins received $16,064.23 of value in exchange for the Shamu Transfer.   At closing, CKK paid the overdue deficiency balance Hankins owed to Nationstar.   This payment satisfied a portion of Hankins' antecedent mortgage debt and led Nationstar to voluntarily dismiss the state court lawsuit filed against Hankins.   This payment constitutes the only value Hankins received at closing for purposes of the claim.

CKK's promise to make future monthly installment payments on his mortgage debt to Nationstar—while Hankins remained liable to Nationstar for the loan's principal balance in excess of $112,000—is not value for purposes of § 548(d)(2)(A).   Hankins may enforce this promise, embodied in the deed conveying the Shamu Property "subject to" the mortgage debt, under applicable state law.   *See Kentucky Realty Co. v. Wade et al.*, 262 Ky. 148, 89 S.W.2d 640 (Ky. 1935); *see also In re White*, Ch. 13 Case No. 94-10076, 1994 Bankr. LEXIS 2379, at *6-7 (Bankr. E.D. Ky. July 13, 1994) (concluding that, when a purchaser of real property in Kentucky deducted mortgage indebtedness from the purchase price, the purchaser impliedly assumed the mortgage under *Kentucky Realty Co.*).   However, this promise did not *satisfy* Hankins' antecedent obligation to Nationstar as the Code requires.

Even if CKK's promise to pay the mortgage in the future could be construed as value within the meaning of the statute, CKK did not quantify that value. CKK offered no evidence of its financial wherewithal to make future mortgage payments as of the time of the transfer. In fact, the evidence reflected that, for an unexplained reason, JCNK Properties, LLC made mortgage payments to Nationstar after the Shamu Transfer occurred, not CKK. As such, notwithstanding conflicting caselaw addressing whether an unperformed promise to pay can constitute value (compare *Kane v. Tin-Lo Chu (In re Hung Chung Chu)*, Ch. 7 Case No. 12-00986, Adv. Pro. No. 12-90091, 2014 Bankr. LEXIS 2463, at *6-10 (Bankr. D. Haw. June 5, 2014) (holding an unsecured promise to pay money can be value) with *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, at 466-67 (S.D.N.Y. 2001) (holding an unperformed promise to pay in the future is not value)), the Court need not reach this issue based on a lack of evidence supporting CKK's argument.

Moreover, although several installment payments were made on the mortgage after the closing, the payments did not materially reduce the outstanding principal balance on Hankins' mortgage debt to Nationstar. In fact, the amount of the mortgage payments roughly coincided with the amount CKK expected Hankins to pay CKK as monthly rent for his tenancy. Thus, Hankins' new obligation to pay CKK rent simply offset CKK's promise to pay installments on the Nationstar mortgage on Hankins' behalf. A sister court encountered a somewhat similar fact pattern in *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778 (Bankr. S.D. Ohio 2009). In that case, a debtor transferred a one-half interest in real property to the defendant. The defendant then obtained a mortgage loan secured by the real property, thereby satisfying the prior mortgage that secured the debtor's indebtedness. The debtor continued to live in the property rent-free and promised to reimburse the defendant for payments made on the new

mortgage loan.   Six months later, the debtor transferred her remaining one-half interest in the real property to the defendant.   The bankruptcy court concluded that the debtor's *second* transfer to the defendant was constructively fraudulent as it was not given in exchange for value. Rather, while the defendant had eliminated the debtor's debt to her bank, that debt was simply replaced by debtor's new promise to reimburse the defendant for his payments on the new mortgage.   *Id.* at 806-07.

Similarly, the holdback credits that CKK retained at the closing ($23,500 and $9,000) purporting to be consideration for the Shamu Transfer did not constitute value to Hankins. CKK retained Hankins' equity in the Shamu Property (a) so CKK could use it to pay the mortgage—even though CKK had agreed to take on that obligation, (b) as prepayment of nearly 30 months of rent—even though CKK required that Hankins pay $800 in monthly rent and had granted Hankins only a five-month tenancy, and (c) to pay Hankins $9,000 in the future—while also holding back $9,000 from the sale price at the closing for the same purpose.   CKK simply seized Hankins' equity in the Shamu Property for its own benefit while not relieving Hankins from personal liability on the Nationstar mortgage.

In sum, Hankins transferred property with a value of $168,000 in exchange for $16,064.23 and an unquantified promise to pay the mortgage loan.   He left the closing on his home without receiving value for any portion of his equity in the property while remaining personally liable on a $112,000 mortgage debt.   Hankins did not receive reasonably equivalent value from CKK for the Shamu Transfer.

**C.      Hankins is not entitled to relief related to the Settlement Agreement.**

For several reasons, Hankins is not entitled to a judgment that the Settlement Agreement constituted a constructively fraudulent transfer to CKK.

14

First, Hankins lacks standing to pursue this claim.   The Derivative Standing Order grants

him standing to pursue relief on the estate's behalf related only to the Shamu Transfer to CKK.

Hankins did not seek and was not conferred derivative standing to pursue any claim the estate

may possess related to the Settlement Agreement.   The Derivative Standing Order does not

reference the Settlement Agreement or any of its terms.   "A trial court . . . may *sua sponte* deny

any claim for lack of standing of the party attempting to bring the claim."   *O'Donnell v.*

*O'Donnell (In re O'Donnell)*, Nos. 04-8054, 04-8056, 2005 Bankr. LEXIS 862, at *8 (B.A.P. 6th

Cir. May 19, 2005) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("the

federal courts are under an independent obligation to examine their own jurisdiction, and

standing 'is perhaps the most important of [the jurisdictional] doctrines'")).

Second, Hankins did not carry his burden at trial to prove that CKK failed to provide

reasonably equivalent value to him in connection with the Settlement Agreement to warrant

avoidance under either § 548(a)(1)(B) or the State Law Claim.   As previously stated, the Court

must assess this issue as of the date of the challenged transfers.   When the parties executed the

Settlement Agreement on July 13, 2020, Hankins transferred to CKK (a) a broad release of any

claims Hankins may have had against CKK, and (b) his permission to show the Shamu Property

to potential future tenants or purchasers for one hour per week for six weeks.   In exchange,

CKK (a) gave Hankins a broad release of any claims CKK may have had against Hankins,

(b) gave Hankins an immediate payment of $5,000, (c) afforded Hankins a rent-free tenancy at

the Shamu Property through November 15, 2020, (d) forfeited the right to collect past due rent

from Hankins, (e) promised (again) to make payments on Hankins' mortgage debt for the Shamu

Property, and (f) agreed to pay Hankins $4,000 when he vacated the Shamu Property by

November 15, 2020.   Hankins did not carry his burden at trial to establish the value of what he

transferred to CKK on July 13, 2020, via the Settlement Agreement, let alone that he received

less than reasonably equivalent value from CKK in return.

Third, Hankins did not establish at trial that, even if the Settlement Agreement should be

avoided as a constructively fraudulent transfer, doing so would provide a benefit to the chapter

13 estate.   If a trustee can avoid a transfer under § 544 or § 548, the trustee may recover the

property transferred or its value "for the benefit of the estate."   11 U.S.C. § 550(a).   "[T]he fact

that avoidance is a necessary precondition to § 550 recovery does not imply that avoidance is a

sufficient condition for § 550 recovery or that avoidance automatically triggers § 550 recovery."

*Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003).

The purpose of § 550 is to "restore the estate to the financial condition it would have

enjoyed if the transfer had not occurred."   *Suhar v. Bruno (In re Neal)*, 478 B.R. 261, 273 (6th

Cir. B.A.P. 2012), *aff'd in part and rev'd in part on other grounds*, 541 Fed. App'x 609 (6th Cir.

2013).   An avoidance action may not proceed unless the estate will benefit from the recovery of

the transferred property.   *See, e.g.*, *Moyer v. Rosich (In re Rosich)*, 570 B.R. 278, 285 (Bankr.

W.D. Mich. 2017) ("without a benefit to the estate, there is no predicate for recovery under

§ 550"); *see also Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 811 (9th Cir. 1994)

(explaining that a trustee only may recover property or its value through an avoidance action

when the result will benefit the estate, not the debtor).   "Whether the recovery of an avoidance

will benefit the estate is determined on a case-by-case basis."   *Nathan v. Brownstone Plastics,

LLC*, 511 B.R. 863, 869 (E.D. Mich. 2014).

Hankins failed to offer evidence at trial sufficient to prove that avoiding the Settlement

Agreement would benefit the chapter 13 estate via the recovery of property of any measurable

16

value.   Because Hankins did not establish a predicate for recovery under § 550 with respect to the Settlement Agreement, the avoidance claim is not viable.

For these reasons, Hankins is not entitled to a judgment avoiding the transfers Hankins made to CKK via the Settlement Agreement.

### D.    Hankins is entitled to a recovery on the estate's behalf under § 550 based on the avoidance of the Shamu Transfer.

Because the Shamu Transfer shall be avoided, the next question is what recovery should be ordered.   "[T]o the extent that a transfer is avoided under [§ 548] the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer[.]"   11 U.S.C. § 550(a).   As stated above, the statute's purpose is to return the estate to the financial condition it would have been in had the transfer not occurred.   *Neal*, 478 B.R. at 273.   Thus, "'the proper focus in [§ 550(a)] actions is not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer.'"   *Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) (citation omitted)).   The Court has discretion in awarding the remedy under § 550(a).   *Grove-Merritt,* 406 B.R. at 811.   Further,

> [c]ase law has developed a number of factors to consider in determining whether to order a recovery of the property or its value.   They include whether the value of the property is contested, is not readily determinable or is not diminished by conversion or depreciation.   Courts generally permit the recovery of the value of the property if such value is readily determinable and a monetary award would provide savings to the estate.

*Id*. at 811-12 (citations omitted).

While the Amended Complaint demands a money judgment, Hankins' post-trial brief requests that CKK, the initial transferee of the transfer, be compelled to return the Shamu Property to the bankruptcy estate.   CKK posits that, if any relief is granted, an award of money damages would be more appropriate than unwinding the Shamu Transfer.

### 1.    A monetary award is appropriate under the circumstances.

The Shamu Transfer deprived Hankins' bankruptcy estate of the value of the Shamu

Property as encumbered by the Nationstar mortgage, *i.e.*, of Hankins' equity in the Shamu

Property.    The Shamu Property remains encumbered by the mortgage, the validity of which is

not challenged.    Ordering the recovery of the Shamu Property itself merely would transfer

encumbered property to the estate, which then would be liquidated at considerable cost.    The

value of Hankins' equity in the Shamu Property at the time of the transfer is readily determinable

and awarding the equity would provide savings to the estate.

Accordingly, under the specific facts of this case, the appropriate recovery is to award the

equity in the Shamu Property that the estate lost owing to the fraudulent transfer to CKK.    *See*,

*e.g.*, *In re Baker*, 17 B.R. 392, 395 (Bankr. W.D.N.Y. 1982) ("The loss incurred by the debtor's

estate as a result of the transfer was the market value of the [property] at the time of the transfer

less the value of valid liens against the [property] at that time."); *Salven v. Munday (In re

Kemmer)*, 265 B.R. 224, 235-36 (Bankr. E.D. Cal. 2001) (calculating recovery under § 550(a)

based on value of equity in property transferred).    The parties stipulated that the fair market

value of the Shamu Property as of the date of the transfer was $168,000.    They also stipulated

that the amount due to Nationstar under the mortgage was $128,096.33 as of the transfer date.

Accordingly, the equity in the Shamu Property at the time of the transfer was $39,903.67.

### 2.    CKK is not a "good faith transferee" under §§ 548(c) or 550(e).

CKK contends that it is a good faith transferee, asserting an affirmative defense under

§ 548(c).    Section 548(c) "provides an affirmative defense that allows a transferee who takes for

value and in good faith to have a lien or retain any interest transferred to the extent that the

transferee gave value to the debtor in exchange for the transfer."    *Simon v. Short (In re Oakland

Physicians Med. Ctr., L.L.C.)*, 596 B.R. 587, 609 (Bankr. E.D. Mich. 2019); *see also Meoli v.*

18

*Huntington Nat'l Bank*, 848 F.3d 716, 729 (6th Cir. 2017) ("An initial transferee is not liable for the transferred property if the transferee: (i) took the property 'in good faith'; and (ii) 'gave value to the debtor in exchange for such transfer'" (quoting 11 U.S.C. § 548(c))).   The burden is on CKK to establish this defense.   *Grove-Merritt*, 406 B.R. at 810.

The Bankruptcy Code does not define the term "good faith," and courts consider whether a transferee acted in "good faith" on a case-by-case basis.   *Id*.   "'[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.'"   *Id*. (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995)).

Here, CKK had knowledge of Hankins' possible insolvency when it acquired the Shamu Property from him.   CKK, through its agent Lori Matthews, was aware that Hankins was in bankruptcy when he began marketing the property in October 2019, and CKK did not dispute that Hankins had apprised Matthews of his financial difficulties.[6]   CKK made its purchase offer contingent on the dismissal of Hankins' bankruptcy case.   CKK was aware that Hankins was significantly delinquent on his mortgage payments to Nationstar and that Nationstar had commenced a foreclosure proceeding against Hankins after he dismissed his first bankruptcy case.   CKK also instructed Novakov to provide for the holdback of funds at closing in part due to the possibility that Hankins would not make timely rent payments based on his history of missing mortgage payments.   CKK is not a good faith transferee under § 548(c).

---

[6] Hankins contends that the reasonably equivalent value analysis must take into account that, according to Hankins, Matthews and Novakov acted as dual agents of CKK and Hankins, and that Novakov breached duties to Hankins in her role in closing the Shamu Transfer.   Having considered the evidence, the Court does not find that Novakov acted as a dual agent.   There also is no claim against Novakov that would require the Court to determine whether she breached a duty to Hankins.   Further, to the extent that Matthews arguably acted as a dual agent, the Court does not rely on that conclusion in finding that CKK did not provide reasonably equivalent value in exchange for the Shamu Property.   Hankins offered no authority from within the Sixth Circuit for the proposition that the purported dual agency bears on a reasonably equivalent value analysis.

CKK also contends that it is entitled to a set-off on any money judgment against it under § 550(e)(1) based on funds it expended to acquire and maintain the Shamu Property.   Section 550(e)(1) "protects a good faith transferee to the extent of the lesser of the cost of any improvement the transferee makes to the transferred property and the increase in value of the property as a result of the improvement."   *Grove-Merritt* at 809.   The intent of § 550(e) is to prevent a "windfall to unsecured creditors" of the chapter 13 estate.   *Hardesty v. Equity One Credit Corp. (In re Farrell)*, 269 B.R. 181, 188 (Bankr. S.D. Ohio 2001).

CKK was not a good faith transferee.   Moreover, any improvements it made to the Shamu Property accrue to its benefit as it will retain ownership.   CKK is not entitled to any lien or offset under § 550(e) from the amount it owes as the initial transferee of the constructively fraudulent transfer.

## IV.    Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.   In reaching these findings and conclusions, the Court has considered all of the parties' stipulations, evidence, and the arguments of counsel, regardless of whether or not they are referred to specifically herein.

Consistent herewith, a separate Judgment shall be entered awarding Hankins, on behalf of the bankruptcy estate and under § 550(a), money damages in the amount of $39,903.67.

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Monday, May 23, 2022**
**(tnw)**